PREET BHARARA
United States Attorney for the
Southern District of New York
By:     JAIMIE L. NAWADAY
        JOSEPH N. CORDARO
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
Tel:    (212) 637-2275/2745
Fax:    (212) 637-2527
Email: Jaimie.Nawaday@usdoj.gov
        Joseph.Cordaro@usdoj.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | **COMPLAINT OF THE** |
| Plaintiff, | **UNITED STATES OF AMERICA** |
| v. | |
| L-3 COMMUNICATIONS EOTECH, INC., | **JURY TRIAL DEMANDED** |
| L-3 COMMUNICATIONS CORPORATION, and PAUL MANGANO, | |
| Defendants. | |

Plaintiff, the United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, alleges as follows:

<u>**INTRODUCTION**</u>

1.      This is a civil fraud action by the United States of America (the "United States" or the "Government") against Defendants L-3 Communications EOTech, Inc. ("EOTech"), L-3 Communications Corporation ("L-3"), and EOTech's President, Paul Mangano ("Mangano," and collectively with L-3 and EOTech, "Defendants"), to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, and damages under the common law theories

of mistake of fact and unjust enrichment, arising from a scheme to defraud the United States Department of Defense ("DoD"), the Department of Homeland Security ("DHS") and the Federal Bureau of Investigation ("FBI") in connection with EOTech's knowing sale of defective holographic weapon sights (also referred to herein as "combat optical sights" or "sights" and sometimes abbreviated "HWS").

2.      As set forth more fully below, for years, EOTech—at one time an L-3 subsidiary, and subsequently part of L-3's Warrior Systems Division—sold combat optical sights to DoD, DHS, and FBI that Defendants knew were materially defective.  The sights are mounted on weapons and used by special operations forces, law enforcement personnel, and others to acquire a target and accurately return fire in a range of extreme environmental conditions.  Beginning around 2006, Defendants became aware that design defects in the sights caused them to fail in cold temperatures and in humid environments.  EOTech was contractually obligated to disclose these defects to DoD, so that DoD could prevent defective products from being fielded to troops. Defendants nevertheless failed to disclose these defects, while touting the U.S. military's use of their products in order to boost their image and drive sales in the commercial marketplace.

3.      Since at least 2004, EOTech has been paid tens of millions of dollars primarily through its contracts with DoD to supply combat optical sights for use in close quarter urban combat as well as longer range target acquisition.  EOTech represented to DoD that its sights performed in temperatures ranging from -40 degrees to 140 degrees Fahrenheit, and in humid conditions.  EOTech also represented that it tested its sights in accordance with military standards to ensure that they met the advertised specifications.  Those environmental performance

2

representations were important to the United States because U.S. troops used EOTech's combat optical sights in Iraq and Afghanistan, as well as in the jungle, mountains, desert, and other extreme environmental conditions around the world.

4.      Since 2010, EOTech also has been paid millions of dollars through contracts with DHS and the FBI to supply holographic weapon sights for use by federal law enforcement agents in a variety of environmental conditions.

5.      By 2006, Defendants knew that the sights failed to perform as represented in temperature extremes.   Specifically, they learned that the sights experienced a condition referred to as "thermal drift," meaning that the sight's point of aim differed from its point of impact (or "failed to hold zero") when subjected to hot or cold temperature.   Although EOTech was contractually required to disclose any information concerning the reliability of the sights, EOTech waited nearly a decade to disclose the defect.   In more recent years, as EOTech subjected new models of the sights to qualification testing, the test engineer documented thermal drift in every sight tested in report after report.   Finally, in March of 2015, the FBI independently discovered the thermal drift defect and presented EOTech with the very same findings that the company had documented internally for years.   Shortly thereafter, EOTech finally disclosed the thermal drift defect to DoD.

6.      By early 2007, Defendants knew of a separate performance failure in cold temperature.   Beginning around 32 degrees Fahrenheit, the sights' aiming dot became significantly distorted, affecting the accuracy of the sight and worsening as the temperature approached -40 degrees.   At sub-zero temperatures, the distortion of the aiming dot affected the

accuracy of the sights by more than 20 inches for every 100 yards.   EOTech delayed disclosing the defect for more than a year, and until it had a fix in place.   Even then, EOTech presented its fix to DoD as an upgrade to a quality product that already conformed to specifications.

7.     By 2008, Defendants also knew that their sights failed to perform as represented in humid environments.   Defendants knew that the sights leaked, allowing moisture to enter and causing a degradation of the reticle (*i.e.*, the circle and aiming dot in the sight necessary for acquiring a target).   Although the sights were always sensitive to humidity, in 2008 EOTech inspected a large shipment of returns from DoD and noticed damage caused by moisture in nearly every sight.   In the years that followed, moisture-related complaints (typically dimming or disappearing reticles) became the number one reason for EOTech's customer returns, and EOTech's own testing repeatedly confirmed that the sights were not properly sealed and quickly degraded when exposed to moisture.

8.     Defendants, however, waited to disclose the problem until 2013, when, once again, they believed they had arrived at a solution.   And again, EOTech pitched its fix as an upgrade to a quality product that conformed to specifications.

9.     The United States seeks the maximum amount of damages and the maximum amount of civil penalties allowed under the False Claims Act and common law for the thousands of defective weapons sights sold to DoD, DHS, and the FBI.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. § 1331.

11.     Venue is proper in this judicial district pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. §§ 1391(b)(1) and (c) because the Defendants transact business in this judicial district.

12.     This Court has personal jurisdiction over each of the defendants by virtue of 31 U.S.C. § 3732(a), a federal statute authorizing nationwide service of process.

**THE PARTIES**

13.     Plaintiff is the United States of America.

14.     Defendant EOTech is a Delaware corporation that designs, manufactures, and markets holographic weapon sights.   From 2005 until 2010, EOTech was a wholly-owned subsidiary of L-3.   In 2010, as part of a corporate restructuring in connection with L-3's acquisition of Insight Technology, EOTech became part of the Warrior Systems Division of L-3. EOTech's principal place of business is at 1201 E. Ellsworth Road, Ann Arbor, Michigan, 48108.

15.     Defendant L-3 is a Delaware corporation with its principal place of business at 600 Third Avenue, New York, New York, 10016.

16.     Defendant Paul Mangano has been employed by and president of EOTech since 2006, and resides in Basking Ridge, New Jersey.

**FACTUAL BACKGROUND**

**A.   The Holographic Weapon Sight as a Combat Optical Sight**

17.     A holographic weapon sight is a non-magnifying weapon sight that allows the user to look through an optical window and see a "reticle image," (*i.e.*, crosshairs, circle and aiming dot, or another representation of a targeting image).   The reticle is superimposed on an image of the field of view.

5

18.     A holographic weapon sight can have advantages over other types of weapon sights.   Unlike telescopic gun sights, which require users to close one eye, a holographic weapon sight allows the user to keep both eyes open, improving peripheral vision.   And unlike typical "red-dot" sights, which project a red dot on the point at which the weapon is aimed, a holographic weapon sight does not emit light that may reveal the user's location.

19.     EOTech's holographic weapon sight technology is used in a variety of weapon sighting/targeting platforms, including individual-user weapons (*e.g.*, rifles, grenade launchers), crew-served weapons, such as heavy machine guns, and heads-up displays used in aircraft and other vehicles.

20.     Some of EOTech's sights are designed particularly for military use.   EOTech's Model MK 56 (military nomenclature: SU-264/PEQ) is designed specifically for crew-served weapons and Model M40GL (SU-253/PEQ) is designed exclusively for grenade launchers. EOTech's Model 553 (SU-231/PEQ) has been used for years by soldiers in the U.S. Special Operations Command.

21.     Since at least 2004, EOTech (and later L-3) has contracted with various DoD components.   The bulk of EOTech's sales have been to the U.S. Department of the Navy, pursuant to contracts made with the Naval Surface Warfare Center in Crane, Indiana ("Crane"). EOTech's original 2004 contract with Crane (the "2004 Contract") was negotiated by EOTech's co-founder and vice-president of sales and marketing (the "Co-founder").

22.     Since 2004, EOTech has earned millions of dollars from selling its weapons sights to DoD for use by U.S. troops, primarily pursuant to the 2004 Contract and subsequent 2010

follow-on contract with Crane (the "2010 Contract").   EOTech has also sold its sights commercially to other Government agencies and components.

23.     Military sales are not only a source of profit for EOTech, but also a powerful marketing tool for the company.   For instance, EOTech advertised on its website that its Model 553 was "created in conjunction with the U.S. Special Operations Command" and is "designed to be the most rugged and battle-proven holographic weapon sight ever developed.   It also offers features required by U.S. Special Forces to meet the stringent requirements of our elite fighting forces."   EOTech advertises that its Model 552 is "the sight of choice by military units like Stryker Brigade, 10th Mountain, and 3rd Infantry" and that its Model EXPS3 was "chosen by the U.S. Special Operations Command . . . as their primary optic for close-quarter engagements."

24.     In the company profile section of its website, EOTech also advertised that "USSOCOM awarded EOTech a contract in 2005.   Special Operations and the Marine Corps chose the HWS as their standard close combat optic.   Elite Army units including Stryker Brigade and the 101st Airborne also made the HWS their optic of choice."

25.     As EOTech's Co-founder testified, "[i]n each different group, typically, it was the elite arm that we were going for first . . . [I]f you get the Michael Jordans of the world . . . to use your product . . . and they deploy with it and they're rubbing elbows with the other operators, [Navy] SEALS . . . it gets out there very, very quickly . . . So our strategy was to get the elite groups first and then . . . let them help us expose it and then the commercial marketplace kicked in after that."

B.  **The Relevant Performance Specifications for Combat Optical Sights**

26.     The military performance specifications set forth in EOTech's 2004 and 2010 Contracts with Crane provide that the purpose of procuring the combat optical sights is to "meet needs across SOF [Special Operations Forces] mission scenarios" and to "increase operator survivability and lethality by enhanced weapon performance, target acquisition, signature suppression and fire control."

27.     The 2004 and 2010 Contracts also provide that "Special Operations Forces (SOF) operate around the world in extreme conditions including underwater, surf-zone, desert, arctic, jungle, and urban environments."   The 2010 Contract also broadly describes the Projected Threat Environment for the sights, stating that "Special Operations (SO) may take place in all areas of the globe, in all terrain and environmental conditions. . . . enhanced target acquisition will become a critical factor to ensure SOF success during engagements."

28.     Therefore, as the Crane contracts make clear, combat optical sights for military use must be able to acquire a target in a wide range of environments and awkward viewing situations. Special Forces units not only operate in a range of extreme environments, but, as one Crane witness explained, also are frequently sent directly from one mission to the next in a very different environment but with the same equipment.   User safety thus depends on a single sight performing properly in a firefight in a range of environments, including hot, cold, and humid.

29.     EOTech has represented to Crane that its sights are "put through an extensive qualification testing to MIL-STD-810 standards to parameters defined by our existing military contracts."   MIL-STD-810 sets forth the proper test procedures to ensure that the sight performs

8

properly even in extreme temperatures and after being subjected to the stress of recoil shock after firing thousands of rounds of ammunition.

30.     Since 2004, EOTech has represented that its sights perform in extreme environmental conditions.   Among other places, EOTech makes these representations in its "General Equipment Description," a comprehensive summary of the technical capabilities and operating parameters of the sight.   The General Equipment Description, among other things, defines "the basic operation, features/benefits" of the sight and details the "core optical, electrical, mechanical, and environmental operation of the sight."

31.     The General Equipment Description, at section 14.0, sets forth the "Environmental Parameters," that is, the "environmental conditions the [holographic weapon sight] was designed to operate within."   As relevant here, EOTech made specific representations about the performance of its sights in both cold temperature and humid environments.

### 1. Performance Specifications Concerning Temperature Extremes

32.     For instance, for at least the last ten years, EOTech has represented that its product operates at temperatures ranging from a low of -40 degrees to a high of 140 degrees Fahrenheit. At -40 degrees, Fahrenheit and Celsius temperatures converge, so -40 degrees Fahrenheit is equivalent to -40 degrees Celsius.

33.     In EOTech's Technical Proposal to Crane, submitted as part of its bid on the 2004 Contract, the company represented that it "has a patented technology that automatically and passively compensates for any change in the illumination wavelength to produce a rock solid reticle over a wide range of operating temperature (-50ºF to 160ºF)."

9

34.     EOTech's General Equipment Description similarly represents, "[a]n optical sight must maintain its zero even with large changes in ambient temperature. . . . [T]he HWS produces a stable holographic reticle image over the entire operating temperature range specified."

35.     In the same document, EOTech represents that the "HWS can be stored with no performance degradation from -40º F to 160º F."

36.     In the Operator's Manual for the M553/SU-231, which EOTech is contractually obligated to provide to the military, EOTech represents that the operation of its product is "-40 to 150 F."   Additionally, EOTech's chief technology officer ("CTO") testified that the temperature range of approximately -40 degrees to 140 degrees Fahrenheit is the "regular military spec" that has always been applicable and is a "well-known military spec."

37.     EOTech has also included this representation regarding operating temperature range on its website and in its catalogs for at least the last ten years.   EOTech thus represents that both the commercial versions and the military versions of its sights operate without degradation in performance in temperatures as cold as -40 degrees, and as hot as 140 degrees Fahrenheit.

38.     Within that temperature range, EOTech repeatedly represented that its sights were "parallax free" or "100% parallax free."   "Parallax" refers to the apparent movement of the reticle relative to the target, and "parallax error" is typically measured in minutes of angle or "MOA." One MOA translates approximately to a 1 inch variation every 100 yards.

39.     The greater the parallax error, the greater the discrepancy between the actual target and the point at which the user is aiming.

### 2.   Performance Specifications Concerning Humidity

40.   Since at least 2003, EOTech has represented that its sights "can operate in an environment with relative humidity at 95% for an indefinite time interval with no degradation to the sight's performance."   For example, EOTech's General Equipment Description indicates that the sight "has sealed optical and electrical subassemblies to ensure the sight is waterproof" that the sight's "internal optics remains moisture free and fog proof in any operating environment," and that "the optical cavity is purged, nitrogen filled and sealed to ensure waterproof and fog proof operation."

41.   In its Technical Proposal to Crane for the 2004 Contract, EOTech similarly represented that it subjected its sights to environmental extremes in accordance with the testing standards specified by the U.S. Military ("MIL-STD-810F") and that the sights passed humidity and other testing "without any observable degradation to [their] performance."

42.   In the Operator's Manual for the M553/SU-231, EOTech also described the "[s]ealing" of the sights as "[f]ogproof internal optics," and represented that the sights were waterproof up to 66 feet in depth.

43.   EOTech's General Equipment Description states that "[t]he aim point does not change when viewed through different parts of the window.   The reticle stays in place on the target whether viewing through the center or the far corners of the window.   There is no need to place the pattern near the center of the window to maintain point of impact."   The Technical Proposal also states that "the ring reticle is visible and the target can be locked on even with

peripheral vision. . . . The operator has to constantly scan the battle field for potential threats.   He cannot be staring at a dot or concentrating only on the area defined the field of view of the sight."

44.     As a Crane witness explained, off-axis angles of viewing and target engagement are an important feature of combat optical sights because in combat situations, an operator may not be in a position to line up the weapon and optical sight through the center of the viewing window. Combat situations often require target acquisition around corners and from other awkward angles.

45.     Every shipment of optical sights contains an implied certification that the sights conform to the performance specifications that EOTech has represented.

46.     Finally, EOTech's Crane contracts contain express disclosure obligations in the event that EOTech becomes aware of any performance issue with the sights.   Specifically, the 2004 and 2010 Contracts provide that "[t]he Contractor shall notify the Government of any and all performance related data that would both positively and negatively impact the reliability, maintainability, availability and/or supportability" of the sights.

47.     Because Crane cannot feasibly test all shipments for all possible defects, the contractor's disclosure of any performance issues allows Crane to determine what testing should be conducted upon delivery and to make any necessary adjustments to fielding the product to military operators.   Crane therefore must be alerted to quality issues so that it can conduct appropriate inspections and testing to prevent fielding defective sights to troops.

48.     Both Mangano and EOTech's contracting officer acknowledged that EOTech was contractually obligated to notify Crane if the sights deviated from the contractual specifications.

Mangano also testified that L-3's ethics policy requires disclosure of quality issues to the Government.

## DEFENDANTS' SCHEME TO DEFRAUD THE UNITED STATES THROUGH FAILURE TO DISCLOSE MATERIAL DEFECTS

49.     Since at least 2006, Defendants knew about defects in their weapons sights that caused product failures, particularly in the extreme environmental conditions in which Special Forces operate.  Instead of making a prompt disclosure of the defects, Defendants delayed disclosure for years, until they believed they had a fix or were compelled to make a disclosure because of employee or other complaints.

### A.  Performance Failures in Temperature Extremes

50.     Although EOTech represented since at least 2004 that its holographic weapon sights operated at temperature ranges from "-40 to 140 degrees Fahrenheit," Defendants learned by 2006 that this was false.  As explained below, the sights failed to maintain zero (or point of aim) over the temperature range specified, and they suffered from severe parallax error at around 30 degrees Fahrenheit, affecting the accuracy by 12 inches for every 100 yards.  The sights performed even worse at colder temperatures.  In short, the sights deviated from their specification by approximately 70 degrees.

### 1.  Defendants' Discovery of the Thermal Drift Defect

51.     In August of 2006, EOTech received a complaint from a U.S. Army Infantry unit, informing the company that the zero on the sight "drifted left and up with use" and advising that they cannot use the sight "if the zero drifts."  EOTech's CTO ordered immediate testing, and e-mailed Mangano and others that "[w]e cannot have soldiers test our sight for drift in the battle

field."   He also acknowledged that "[a] sight is no good if the zero changes with temperature." EOTech's Co-founder responded that the issue was not just as to the Army unit, "but to all the potential customers.   What of an issue of a recall?"

52.     On August 23, 2006, another employee responded in agreement with EOTech's Co-founder, stating "I think we should strongly consider recalling [the sights].   This is likely one of the worst types of failure since most users won't notice the problem until their life is on the line."   Nevertheless, the failure was neither fixed nor disclosed in 2006.   In 2008, one employee commented in an email to EOTech's lead engineer about unresolved product performance issues that "[t]he completion date of the task to find the root cause of the [thermal] drift was listed as TBD.   I took it as no plan or schedule was developed for completion of the task."

53.     In 2009 a new test engineer joined EOTech and became responsible for new product qualification testing.   Before any new sights, or a modification of existing sights, were rolled out to customers, the test engineer conducted testing to determine whether the existing sights performed consistent with expectations.   The test engineer's reports between 2010 and 2012 document thermal drift in every sight tested, with some models showing a drift of 6 to 12 MOA, or 6 to 12 inches per 100 yards.

54.     Despite the engineer's findings, no product was ever held back from sale due to thermal drift.   When asked whether anyone at the company was investigating the root cause of, or fix for, thermal drift during that time, the test engineer said he could not recollect any work being done on the problem.

55.    In 2014, an internal report on unresolved performance issues confirmed that thermal drift remained an issue, stating that the company noted "zero stability/[Point of Aim/Point of Impact] concerns: samples did not maintain zero to specification after stress tests."

56.    Finally, in March 2015, the FBI discovered what EOTech had known for years.   In conducting its own testing of the sights for zero stability, the FBI exposed the sights to normal temperature variations for the state of Virginia, a temperature range much narrower than -40 to 140 degrees Fahrenheit.   A ballistics team then tested the sights for point of aim/point of impact accuracy, or zero stability, and similarly found significant drift at both higher and lower temperatures.

57.    After discovering the problem in March 2015, the FBI immediately presented its findings to EOTech.   Shortly thereafter, EOTech disclosed the issue to Crane, but stated that the problem was only recently discovered and that it was devoting substantial efforts toward finding a solution.

58.    When asked about the company's previous efforts at finding a solution for thermal drift, a former EOTech optics engineer explained that the company knew for years that thermal drift was an inherent design flaw with the "Generation II" model of the product that was specially designed for military use, and that no fix existed without substantial modification of the product.

### 2.    Defendants' Discovery of the Cold Weather Distortion Defect

59.    In January of 2007, EOTech was in the midst of bidding on its first major European military contract, one for the Norwegian Army.   EOTech significantly lowered its price in an attempt to outbid a competitor, underpricing the competitor by approximately 50 percent.

60.     Mangano, EOTech's Co-founder, and another employee went to Norway for the final stages of the negotiation.   While conducting qualification testing, however, the Norwegians noticed that in low temperatures, there was a distortion of the aiming dot, causing it to grow and obscure the target scene.   The Co-founder recently testified that the distortion of the aiming dot occurred at "twenty degrees Fahrenheit and got progressively worse to the negative 40 operating specification.   On top of that, it became worse behind a magnifier, significantly worse behind a magnifier."   Mangano and other employees referred to the defect internally as "cold weather distortion."

61.     EOTech quickly confirmed the Norwegians' findings.   On February 2, 2007, the CTO emailed a memo explaining the defect to other EOTech employees and suggested that it be forwarded to the Norwegians.   The CTO's memo admitted that "[w]e had never looked at the sight performance at very low temperature.   We had assumed the sight performed about the same at 20 degrees C ± 40 degrees C.   We were quite surprised by how poorly the sight performed at -20 degrees C."   The CTO's memo also admitted that the sight demonstrated "a completely unacceptable performance."

62.     In replying to the CTO, one sales employee asked, "do we really want to admit that we never tested the HWS at cold temperature when we list on the published specs that it operates to -40 C? . . . Also, temperatures in Afghanistan are very, very cold in the winter.   We should say that our HWS performs very well (as a 1x) in both temperature extremes."   Another sales employee responded that "[s]tating that we never did low temperature testing would not make me feel comfortable.   It begs the question [] what else have we not tested."

63.     The CTO replied that the "sight would have [a] problem at -40 deg even at 1x due to excessive parallax error" and that "[t]he parallax error even at 32 deg F is 12 moa, at 5 deg F (the temperature outside right now) is > 20 moa. . . . It is not an acceptable performance.   People have to know what need[s] to be done so they can start planning for it. . . . Sometimes the truth is the best answer."

64.     In other words, even at 32 degrees Fahrenheit, the sight's accuracy varied by 12 inches per 100 yards, and at 5 degrees, the sight's accuracy varied by more than 20 inches per 100 yards.

65.     When questioned about EOTech's cold temperature testing, the CTO testified that when EOTech testers took the sights out of the cold temperature chamber, "instantly, they fogged up."   As a result, he explained, they had to wait until the sights warmed up to test them, acknowledging that the sights were thus "not at minus 40 anymore at that point. . . . [T]hey should have known better, but that's what they did."   In other words, the testing that EOTech conducted was not at -40 degrees.

66.     In an email to EOTech's Norwegian contacts in March 2007, Mangano acknowledged that there was a "low temperature optical distortion issue," describing it as a "critical technical issue" and "a universal issue for us."

67.     The Norwegians ultimately rejected EOTech's bid and awarded the contract for optical sights to a competitor, even though EOTech's bid was 50 to 60 percent less than the competitor's.

68.     Following their decision, the Norwegians held a teleconference with EOTech's Co-founder and three other employees to explain their decision.   During the teleconference the Norwegians repeatedly stated that EOTech's inability to solve the distortion problem was the reason they were rejecting the sights.

69.     The Co-founder testified that the Norwegians stated that "they could not put their soldiers in harm's way, something to that effect, and [that he] could not argue with that."   Another former EOTech employee who had participated in the teleconference similarly remembered that the Norwegians explained that they did not want to risk the operator's safety and that their concern drove the decision to reject the EOTech sights.

70.     The Co-founder summarized the teleconference in an e-mail to Mangano.   He indicated to Mangano that "the technical problem raised a huge concern" for the Norwegians, "the cold weather optical distortion issue was the main drawback," and that the Norwegians "went with the safe bet."

71.     By early 2007, Defendants thus realized that every product they had shipped to Crane and other customers failed to perform in accordance with the product's specifications concerning cold temperature operation.   If the sight was taken even to moderately cold temperatures, ranging from 32 degrees to 5 degrees Fahrenheit, the user's aim would be affected by error ranging from 12 MOA to more than 20 MOA, *i.e.*, more than 20 inches per 100 yards.

### 3.  Defendants' Delayed Disclosure of the Defect

72.     In March 2007, Mangano and other employees participated in an email exchange regarding whether EOTech should inform Crane about the cold weather distortion defect.   At that

point, the CTO predicted that a solution would be in place by May, and Mangano and other subordinate EOTech managers decided to wait to disclose the issue until they could present it along with the solution.

73.     Developing and implementing the fix for cold weather distortion took months longer than anticipated.   In fact, for most of 2007, developing a fix for the distortion defect was put on "Red Review," meaning that weekly meetings were held to review the status of the fix.   In the meantime, EOTech continued to ship its sights to Crane and other customers without notification of the defect, and continued to transmit invoices to Crane for payment.

74.     The decision maker on disclosure of quality-related defects was Mangano.   As the Co-founder testified, until a solution was in place, Mangano "did not want this [defect] disclosed to the marketplace at all and he specifically communicated that."   According to two EOTech employees, the Co-founder fought repeatedly with Mangano over whether to disclose the distortion defect, with the Co-founder supporting immediate disclosure and Mangano opposing it. Moreover, Mangano admitted at a deposition that the decision to disclose a quality issue to a customer ultimately was his.

75.     In September 2007, the Red Review team indicated that the fix was still months away.   As a result, Mangano determined that any disclosure would be months away.   By email dated September 16, 2007, Mangano reported to other senior managers that "[t]he take-away from this past Friday's Red Review is that we will not be in a position to fully disclose to Crane and Colt/Canada [a Canadian EOTech customer] until November at the earliest."   Mangano added that "[w]e will only disclose to Crane and Colt/Canada.   Given that we have no product returns

19

over the years from other military customers reporting the issue, we see no need to communicate the patent defect."

76.     Shortly thereafter, a sales and marketing employee wrote to the Co-founder "in confidence" about Mangano's email, stating, "I have an issue with this . . . Is it worth risking one person's life on this?   What if there is a guy in the mountains in Afghanistan, and he brings up his sight picture on the enemy who has the drop on him with an AK[?]   He takes aim as quickly as possible and puts a shot that misses wide due to the distortion of the reticle.   He's dead a fraction of a second later from a 7.62 mm round.   This is a dramatic example, but this is the risk that is posed the longer the end-user is unaware of the risk."

77.     The sales and marketing employee added that "[w]e have been sitting on this issue for a long time and it makes me very uncomfortable that we have still done nothing about this to protect soldiers and LEOs [law enforcement officers] of both this country and those across the globe from getting killed.   What if it has happened already?"

### 4.  EOTech Conceals the Cold Weather Distortion Defect (and Other Defects) in Its Bid to the Army

78.     In September 2007, with a fix for the cold temperature defect projected to be months away, EOTech bid on a large contract to produce combat optical sights for the Army, specifically the Armament Research, Development and Engineering Center ("ARDEC").

79.     Leading up to the bid submission, which included both a written proposal and a sample of the sights, EOTech produced a special batch of sights for the purpose of identifying a "golden unit" that could pass fourteen different qualifying tests for the ARDEC contract.

80.    As one of the test engineers explained, the sights initially all failed because they fogged up during a temperature cycling test, which subjected the sights to extreme heat and cold.

81.    EOTech determined that the cause of the fogging was the seal (or gasket) surrounding the optical cavity, which absorbed moisture and then released it when heated to high temperatures.

82.    By email dated August 31, 2007, just days before the bid samples were to be submitted to ARDEC, the CTO sent an email to Mangano and other indicating that "We found the source of the water in the sights, it is from the gasket material. . . . The sights we baked in a vacuum oven . . . passed.   We are now drying all the ARDEC sights . . . for 2 hours.   They should all pass the temp cycling test."   Other internal company documents confirm that the sights sent to ARDEC were from a specially prepared batch as opposed to the normal manufacturing process.

83.    Even after that baking process was put in place, the engineer who oversaw the ARDEC testing estimated that the failure rate remained at "at least fifty percent" as a result of the sights failing various other qualification tests, including a thermal drift test.

84.    Additionally, the sights' operation at cold temperature had still not been fixed. The proposed fix at that time required four to five modifications to the product.   Although EOTech initially planned to include none of the fixes, it later decided to include a partial fix to afford the company a greater chance of passing ARDEC's initial qualification testing.

85.    By email dated August 17, 2007, the CTO warned Mangano and others that "[i]n the ARDEC solicitation, they specified a parallax error of no more than 3 moa.   If we win that contract and deliver [the] sight without the cold weather distortion fix, then we have a problem."

21

86.     Around this time the Co-founder repeatedly complained to Mangano that the defect had to be disclosed.  The Co-founder testified that "[t]his was the big Kahuna, a big military contract for us. . . . And in September of that year . . . we were submitting a proposal to them.  And . . . I called up a number of times. . . . [W]e know that there's a problem with the product and . . . we're submitting samples and [saying that] our product meets this spec when it really doesn't meet this spec. . . . And Paul Mangano specifically said, 'We will tell them after.  If we win the contract, we will tell them afterwards,' something to that effect."

87.     In its written proposal to the Army dated September 4, 2007, EOTech represented that it was "well qualified to perform the required effort on this program based on [its] successful track record of performance on similar programs" and that it was "confident that it [would] meet the performance requirements on this contract with little to no risk."

88.     EOTech also stated that its performance under its existing Crane contract demonstrated that the sight could meet "strict performance requirements in terms of durability . . . and environmental performance."  Finally, EOTech represented that it was prepared to meet any "surge requirement" by the Army and could produce up to 20,000 sights per month if necessary based on the ongoing wars in Iraq and Afghanistan.

89.     For reasons unrelated to cold temperature (or the other defects discussed herein), the Army awarded the contract to EOTech's competitor.

### 5.   The 2008 Ethics Complaint

90.      In September 2007, Mangano fired the Co-founder.   Subsequently, in March of 2008, unaware whether the distortion issue had ever been disclosed, the Co-founder filed an ethics complaint through the L-3 ethics complaint system, contending that the product he helped bring to market was defective.

91.      The Co-founder's ethics complaint included a 10-page summary of the timeline of discovering and confirming the defect, and an explanation of the performance specifications and why he believed the defect was a material issue.   The Co-founder's summary stated that "[t]his known product defect degrades the operation of the sight and could very possibly negatively affect the user's performance, and in turn, could place them in harm[']s way."

92.      The Co-founder's summary also chronicled the lack of disclosure, stating that the Norwegians discovered the problem and rejected the sights, and that other customers were not informed "under direction from the President," notwithstanding that there were "at least 2 known multi year US government contracts (and possibly more) that specifically call out language in the FAR [Federal Acquisition Regulations] or terms/conditions of the contract that defines a process for the disclosure of a product defect and the subsequent testing, documentation, verification, and recertification of the product defect."

93.      In April of 2008, L-3 investigated the ethics complaint and contacted Mangano and other EOTech employees.   The investigation was closed the same month.

**6.   EOTech's Engineering Change Proposal to Crane**

94.     In the spring of 2008, EOTech partially disclosed the distortion defect in an engineering document referred to as an Engineering Change Proposal or "ECP."

95.     Whenever EOTech made a change to a sight that affected its form, fit, or function, it was contractually obligated to submit an ECP to Crane detailing the change and the reason for it so that Crane could evaluate whether the product, as modified, would still perform as required.

96.     EOTech's ECP described a change to the sights that would improve their performance at cold temperatures, but said nothing about the severity of the parallax error on all sights shipped to date, or about the Norwegians having rejected the sight because of the extreme parallax error.

97.     The ECP suggested that the cold weather distortion fix was a product improvement resulting from EOTech's own initiative, as opposed to a significant product defect.   Specifically, the ECP stated, "L-3 EOTech continuously tests and improves the performance of its products. Recent tests of Holographic Weapon Sights including the SU-231/PEQ with a 4X scope have shown an increase of parallax error at very low temperature."

98.     The ECP further stated misleadingly that "L-3 EOTech, Inc. has not received a single report of a problem from the field regarding optical performance of the sight at cold temperature.   But with the increasing interest in the use of the sight with a magnifying scope, we are improving the performance of all our sights at low temperature down to -40 deg C."

**B.  Performance Degradation in Humidity**

99.     EOTech represented in its General Equipment Description that its sights operate even in 95% humidity without degradation in performance and passed humidity testing conducted in accordance with military standards.  It also represented that the reticle is designed "to be instantly visible in any lighting environment and . . . hold[s] onto target regardless of the shooting angle or position. . . . [T]he reticles are designed to remain in the operator's view while sweeping an engagement zone, in canted or awkward shooting positions, or in situations where improper or sloppy cheek weld (head/eye alignment) are not met."  EOTech further represented that to achieve such performance, the sight's optical cavity is purged of ambient air, and filled with nitrogen to keep moisture from seeping in.

100.    Furthermore, EOTech represented in a Technical Proposal to Crane for the 2004 Contract that it subjected its sights to environmental extremes in accordance with the MIL-STD-810F testing standards and that the sights passed humidity and other testing "without any observable degradation to [their] performance."  In the Operator's Manual for the M553/SU-231, EOTech also described the "[s]ealing" of the sights as "[f]ogproof internal optics," and represented that the sights were waterproof up to 66 feet in depth.   In addition, EOTech stated in its Technical Proposal that the user could lock onto the target "even with peripheral vision."

101.    For years, however, Defendants have known that the sights' optical cavities leak, allowing moisture to penetrate the edge of the holographic grating, which shifts the reflected wavelength and causes the reticle to dim and eventually disappear.  Defendants referred to the problem internally as "moisture incursion" or "grating delamination."

### 1.  A Defect "Since the Beginning"

102.    It was well known at EOTech that moisture incursion was a significant vulnerability of the sights.  EOTech's CTO testified that when the "hologram that make[s] the image, gets slowly degrade[d], then the laser [has] to be brighter and brighter to compensate and draw more current.  And . . . people start noticing in time that their battery life get[s] shorter and shorter."  At a deposition, Mangano admitted that he knew moisture incursion was the number one reason for customer returns for the past several years and stated that he could not recollect any issue that was on Red Review longer than moisture incursion.

103.    Additionally, dozens of Red Review PowerPoint presentations over the years state that moisture incursion is a "legacy issue" and the "number one reason for customer returns."

104.    Presentation notes accompanying a Red Review presentation on January 25, 2013, confirm that "[m]oisture incursion in the grating has been an issue since the start" and EOTech "see[s] the moisture incursion issue on unsealed gratings that have been outside of a controlled environment (container with desiccant/desiccators cabinet) for at least 1 day or in sights that have been out in the field."

### 2.  Humidity Defect Worsens in 2008

105.    As one former optics engineer explained, in or around 2008, through inspecting a shipment of returned sights from Crane, the company realized it had an "epidemic" of moisture incursion.  And according to EOTech's current optics engineer, by 2009, when he joined the company, "it was generally understood that the moisture was moving through the edge seal."

26

106.    In June of 2009, EOTech sent a sample of newly-manufactured sights to an independent testing laboratory to determine whether the seal on the sight was an effective barrier against ambient air and moisture.    The laboratory checked for "gross leaks" (typically indicating that the seal can be penetrated by a liquid) by immersing the sights in fluid and checking for bubbles emanating from the seal area.    The laboratory reported to Defendants that "[t]he results of the gross leak testing revealed all four devices failed hermetic testing. . . . Bubbles were evident from the devices at various locations. . . ."    The laboratory identified three to four leak paths on each sight.

107.    In August of 2009, the same laboratory conducted an internal vapor analysis on six sights, specifically those in use by the U.S. Special Operations Command operators, to determine whether the sights leaked the nitrogen gas that was injected into the sights to keep out moisture. The laboratory concluded that all of the sights in the sample leaked nitrogen.    When EOTech then asked the laboratory to conduct additional testing to assess the rate and the path of the leaks, the laboratory reported that it was unable to complete the testing because the "[l]eak rate was greater than the instruments' detection limit."

108.    An EOTech test engineer subsequently prepared a single-page summary of the results, reporting that two "Significant Findings" of the testing were that "[n]itrogen & moisture content reach[] near ambient levels within a 1 month period" and that the use of a "[d]essicant [sic] provides a significant improvement to moisture content but only for a short period of time (< 1 month)."    According to a former EOTech optics engineer, all of the senior managers were aware of the results, including Mangano.

27

109.    In other words, by 2009, EOTech knew that ambient air, with its relative humidity, filled the optical cavity almost immediately.   Although the damaging test results pertained to the very units being shipped to Crane, EOTech did not disclose them.

110.    On multiple occasions since 2009, EOTech sent additional samples of sights to the same laboratory for new testing but received similarly negative results.

111.    For example, in March of 2011, an EOTech test engineer asked the laboratory to conduct gross leak bubble testing on an additional five sights.   Again, the laboratory reported that "[a]ll devices exhibited bubbling."

112.    In April of 2013, an EOTech test engineer asked the laboratory to identify a leak path in the sights, and acknowledged in an email that "our products are not hermetically sealed . . . The upper cavity (viewing portion) is nitrogen filled to prevent fogging of the optics, but we know they slowly leak over time."

113.    In June of 2014, the laboratory conducted gross leak testing on five sights and, again, found all of them to have significant gross leaks.   The tested sights were found to have leak rates between four and thirty-three times the gross leak threshold.   In short, the testing results again demonstrated that the sight's seal is not an effective barrier against moisture.

114.    EOTech's customer service manager also tracked the problem for years through customer complaints.   In 2011, internal EOTech customer service presentations indicated that the moisture incursion problem was "escalating to [the] next level" and that the company was "starting to receive sights back in for service that have already been in before for grating delam[ination]."

115.   In April of 2012, EOTech's customer service manager emailed other senior managers, including Mangano, stating, "[a]s you were aware at the cust[omer] care meeting, delaminating is the major issue.   The sights [listed] below . . . are all relatively new product and all of these are experiencing delam to the point they should not be demo'd to customers.   The fact that we had 3 of our LE [law enforcement] reps so far return most of their samples for repair serves as a poignant reminder as to just how serious of an issue this is and . . . the priority level of attention this should receive."

116.   At the end of 2012, EOTech began receiving complaints from Immigration and Customs Enforcement ("ICE"), a component of DHS, that it had hundreds of sights that were failing for dim reticles.

117.   EOTech internally reported that "[b]ased on [ICE's] feedback from yesterday, the armorers have a problem with failures and we have an image problem with the field agents . . . . ICE's armory is completely out of sights to support the field agents so [EOTech's customer service manager] is in a panic."   EOTech's customer service manager reported that he was handling a sight repair for an agent whose sight had already failed twice and expressed concern because the company was on the verge of bidding on a solicitation for several thousand new sights for ICE.

### 3.   The 2013 Complaint by the Customer Service Manager

118.   Shortly thereafter, on January 4, 2013, EOTech's customer service manager emailed several senior managers concerning the steady flow of returns he was receiving for moisture incursion, saying, "Respectfully, I am trying to limit the number of these [customer complaints] I pass along to you but this is becoming an everyday occurrence. . . . I have to face

these customers every day with hat in hand to defend our products . . . . This issue was prevalent when I hired in 5 years ago, and is still eating our lunch.   It may even possibly cost us a 6,000,000.00 bid for a Federal Agency."

119.    The same day, the customer service manager approached the EOTech ethics officer to discuss the concerns in his email.   The EOTech ethics officer emailed a copy of the email and a summary of their conversation to Mangano, reporting that the customer service manager said that he and another customer service employee "feel like they are lying to customers when they talk to them about [moisture incursion]."

120.    The ethics officer also suggested to Mangano that "we need to know exactly what they (and anyone representing EOTech) are telling customers and we should develop a response that we all agree with."

121.    Yet when the ethics officer was questioned at a deposition about whether she took any steps to find out what the customer service manager was telling customers, she testified that she "handed it off to Paul [Mangano] . . . and let him handle it."   Similarly, when Mangano was questioned about the employee's complaint, he admitted that, although he was responsible for the representations made to customers, he had no idea what the customer service representative was telling customers or whether there was any investigation into the issue.

### 4.   The March 2013 Crane Program Review and July 2014 ECP

122.    Although EOTech for years had prepared internal presentations and reviewed damaging test results on moisture incursion, it shared none of this information with Crane or other customers until 2013, when it planned to modify the product to correct the defect.

123.    In March of 2013, EOTech had planned a contractually-required "program review" meeting with Crane, the purpose of which was to review its performance and any issues with its product or its delivery.   At that point EOTech personnel expressed that they were on the verge of a solution to moisture incursion that would require submission of an ECP to Crane.   As the quality control manager explained, because EOTech would be submitting an ECP around March of 2013 anyway, they decided to raise the issue at the program review meeting.

124.    At the end of the meeting, an EOTech engineer mentioned in passing that the company identified moisture incursion as an issue that could affect sights after a number of years, but that the company was planning on submitting an ECP that would describe a new grating in the sight that was unaffected by moisture and would therefore improve the brightness of the reticle.

125.    According to both the Crane and EOTech witnesses who attended the meeting, the discussion regarding moisture incursion lasted less than five minutes.

126.    Mangano testified that the decision to mention moisture incursion to Crane in 2013 was also driven by the fact "that there was a YouTube video . . . showing what reticle fade was and they were wondering why it happened.   When I heard that, that's when I got very concerned . . . . I did not want Crane to hear it third-hand on a YouTube video that there was a reticle fade issue." Mangano admitted that had the YouTube video not surfaced, that would have affected his view of whether EOTech should mention moisture incursion to Crane.

127.    Because the Crane employees had no reason to suspect a humidity issue with the sights, they had not been subjecting them to humidity testing or inspecting the edges of the reticles

for signs of dimming or other failure.   Moreover, field returns from troops up until that point had not been inspected for signs of moisture incursion.

128.   After the March 2013 program review, Crane employees involved in the weapons accessories program began to gather more information to assess the scope and severity of the issue. One Crane employee conducted a post-deployment visit with the 7th Special Forces Group, whose members served in Central and South America in high humidity environments.   She learned that 20 out of 21 Special Forces Weapons Sergeants for the Operational Detachments who took part in the deployment experienced problems with reticle fading.   The 7th Special Forces Group therefore grounded its entire stock of EOTech 231A sights.

129.   As Crane engineers began inspecting returns from troops in the field, they found failure rates for reticle performance of around 85%.   Upon learning about these failures, the U.S. Special Operations Command project manager for weapons accessories directed Crane that he did not "want to take delivery of anymore systems until we confirm we have a fix and a plan to fix our fielded systems too."

130.   An L-3 employee learned that the reticle failure issue had been elevated to the project manager and spoke with him about his concerns.   The employee then emailed Mangano in June of 2014, relating the project manager's report that the troops "have seen the reticle dim and some of the units shut off or power down" and that he was concerned about "the 231As that are in the field on the weapons of the operators deployed.   He is concerned that as an operator goes through that door in combat that the device will fail causing the operator to be killed or wounded."

131.   In July of 2014, Crane engineers conducted ten-day humidity testing on newly-delivered sights.  The testing was conducted in accordance with military standards and tested the sight's ability to withstand 95% humidity at temperatures at the higher end of the operating range over a ten-day period.   Twenty-five sights were selected for testing, all of which had a manufacture date in or around March of 2014.

132.   The purpose of the ten-day humidity test was to determine whether the product will degrade in normal-usage conditions in a humid environment by subjecting the product, in a shorter time span, to stresses that are slightly more severe than those experienced in a normally humid environment.

133.   Of the 25 sights subjected to humidity testing, 23 failed.  The results of the humidity testing prompted Crane to begin inspecting the reticles upon delivery to determine whether any showed signs of visible dimming around the edges of the viewing window.

134.   In conducting inspections of newly-delivered sights, a Crane engineer found that approximately 95% failed inspection, in that they already exhibited dimming around the edges of the sight, with about 20-30% exhibiting "catastrophic" failures, meaning that the reticle was not visible at all in some area of the viewing window.

135.   Also in July of 2014, EOTech submitted its ECP on the modification to address moisture incursion.  The ECP did not disclose that moisture incursion was a "legacy issue" plaguing the sights for years that caused them not to perform to their environmental performance specifications.   Nor did the ECP disclose the testing results EOTech received as recently as June of 2014 showing that the seal on the sight was an ineffective barrier against moisture.

33

136.    Instead, the ECP to Crane merely stated that "EOTech has had a continuous improvement project to address the potential for the reticle of the Holographic Weapon Sight (HWS) to dim slowly over time starting at the edges of the field of view. . ."

137.    In sum, although EOTech and L-3 have represented for the last ten years that their holographic weapons sights perform even in extreme environmental conditions, Defendants knew their products failed to perform as represented in extreme temperatures and in humid environments.  They also knew that these failures would be material to Crane based on the reactions by others in the customer marketplace, such as the FBI, the Norwegians and DHS. Defendants nevertheless delayed disclosing these defects for months or years until EOTech could devise a fix, and then suggested that the fixes were improvements of performing products, not attempts to address longstanding defects in sights that EOTech had been shipping to DoD, DHS, and the FBI for years.

138.    As provided under the 2004 and 2010 Contracts, EOTech electronically submitted to Crane invoices for the sights via the DoD Wide Area Workflow Receipt and Acceptance (WAWF) system.   These invoices specified, among other things, the quantity of sights shipped to Crane, and the amount of payment sought from DoD.   The United States thus paid millions of dollars to EOTech for sights that Defendants knew were defective.

**CLAIMS FOR RELIEF**

**COUNT I: FOR DAMAGES AND CIVIL PENALTIES UNDER THE FALSE CLAIMS ACT**
**(31 U.S.C. § 3729(a)(1) (2006), AND, AS AMENDED, 31 U.S.C. § 3729(a)(1)(A))**
**(AGAINST ALL DEFENDANTS)**

139.    The Government incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

140.    As set forth above, since 2004, EOTech made representations that its sights were parallax free, and operated at temperatures as cold as -40 degrees and in humid environments. EOTech made these representations, among other places, in their Technical Proposal and Operator's Manual, which were provided to Crane in connection with EOTech's 2004 and 2010 Contracts, as well as to other Government customers.

141.    Defendants knew that their representations were false, or acted in deliberate ignorance and/or with reckless disregard of the truth of their representations.   Defendants knew that the sights suffered from both thermal drift and significant parallax error beginning around 32 degrees Fahrenheit, and that the sights degraded more quickly than represented in humid environments.

142.    Even though Defendants knew of EOTech's contractual obligation to disclose reliability issues involving the sights, Defendants delayed disclosure of this negative information about the sights' performance to the Government.   Moreover, even after Defendants learned of the defects, EOTech continued to sell sights to the Government without disclosing the defects.

143.    Defendants thus knowingly presented or caused to be presented false or fraudulent claims to the United States for payment.

35

144.     Defendants' misrepresentations about the performance of the sights were capable of influencing, and thus were material to, the Government's decisions about purchasing and/or pricing the holographic weapons sights.

145.     The Government has incurred losses as a result of Defendants' false or fraudulent claims in that it purchased sights that were materially different than what they were represented to be.   The Government also has experienced sight failures and expended funds for repairs.

146.     Pursuant to the False Claims Act, Defendants are liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government has sustained because of Defendants' actions.

### COUNT II: FOR DAMAGES AND CIVIL PENALTIES UNDER THE FALSE CLAIMS ACT (31 U.S.C. § 3729(a)(2) (2006), AND, AS AMENDED, 31 U.S.C. § 3729(a)(1)(B)) (AGAINST ALL DEFENDANTS)

147.     The Government incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

148.     As set forth above, since 2004, EOTech made representations that its sights were parallax free, and operated at temperatures as cold as -40 degrees and in humid environments. EOTech made these representations, among other places, in their Technical Proposal and Operator's Manual, which were provided to Crane in connection with EOTech's 2004 and 2010 Contracts, as well as to other Government customers.

149.     Defendants knew that their representations were false, or acted in deliberate ignorance and/or with reckless disregard of the truth of their representations.   Defendants knew

36

that the sights suffered from both thermal drift and significant parallax error beginning around 32 degrees Fahrenheit, and that the sights degraded more quickly than represented in humid environments.

150.    Even though Defendants knew of EOTech's contractual obligation to disclose reliability issues involving the sights, Defendants delayed disclosure of negative information about the sights' performance to the Government.   Moreover, even after Defendants learned of the defects, EOTech continued to sell sights to the Government without disclosing the defects.

151.    Defendants' misrepresentations about the performance of the sights were capable of influencing, and thus were material to, the Government's decisions about purchasing and/or pricing the holographic weapons sights.

152.    Defendants thus knowingly or with deliberative ignorance or reckless disregard of the truth made, used, and caused to be made and used, false records and statements material to their false or fraudulent claims to the United States for payment.

153.    The Government has incurred losses as a result of Defendants' false or fraudulent claims in that it purchased sights that were materially different than what they were represented to be.   The Government also has experienced sight failures and expended funds for repairs.

154.    Pursuant to the False Claims Act, Defendants are liable to the United States for a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein, plus three (3) times the amount of damages which the Government has sustained because of Defendants' actions.

### COUNT III: DAMAGES FOR PAYMENT BY MISTAKE OF FACT
### (AGAINST ALL DEFENDANTS)

155.    The Government incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

156.    As set forth above, since 2004, EOTech made representations that its sights were parallax free, and operated at temperatures of -40 degrees to 140 degree Fahrenheit and in humid environments.   EOTech made these representations, among other places, in its Technical Proposal and Operator's Manual, which were provided to Crane in connection with EOTech's 2004 and 2010 Contracts, as well as to other Government customers.

157.    Defendants' representations concerning the sights' performance in extreme temperatures and humidity were false.

158.    From 2004 to 2014, DoD paid millions of dollars for EOTech's defective sights due to Defendants' false statements and omissions concerning the sights' ability to perform in temperature extremes and in humid environments.

159.    Since at least 2010 to the present, DHS and the FBI paid millions of dollars for EOTech's defective sights due to Defendants' false statements and omissions concerning the sights' ability to perform in temperature extremes and in humid environments.

160.    By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled.   Defendants therefore have received payments based on a mistake of fact in amount to be established at trial.

## COUNT IV: DAMAGES FOR UNJUST ENRICHMENT
### (AGAINST ALL DEFENDANTS)

161.    The Government incorporates by reference the allegations in each of the preceding paragraphs as if fully set forth in this paragraph.

162.    From 2004 to 2014, DoD paid millions of dollars for EOTech's defective weapon sights due to Defendants' false statements and omissions concerning the sights' ability to perform in temperature extremes and in humid environments.

163.    Since at least 2010 to the present, DHS and the FBI paid millions of dollars for EOTech's defective weapons sights due to Defendants' false statements and omissions concerning the sights' ability to perform in temperature extremes and in humid environments.

164.    The Government is entitled to the return of all payments by DoD, DHS, and the FBI for defective weapon sights due to the false statements and omissions by the Defendants.

165.    By reason of the above-described payments, Defendants have received money, directly or indirectly, to which they were not entitled, at the expense of the United States. Defendants therefore have been unjustly enriched in an amount to be established at trial.

WHEREFORE, the United States respectfully requests judgment against Defendants as follows:

a.      On Counts One and Two (False Claims Act), a judgment against all Defendants for treble damages and civil penalties for the maximum amount allowed by law;

b.      On Counts Three and Four, a judgment against all Defendants in an amount equal to the money paid by the Government to, or received by, these Defendants directly or indirectly, plus interest;

c.      For an award of costs, plus interest, as provided by law; and

d.      For such further relief that the Court deems just.

Dated:    New York, New York
          November 24, 2015

                              PREET BHARARA
                              United States Attorney for the
                              Southern District of New York
                              *Attorney for the United States of America*


                    By:      _/s/ Jaimie L. Nawaday_
                              JAIMIE L. NAWADAY
                              JOSEPH N. CORDARO
                              Assistant United States Attorneys
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Tel:      (212) 637-2275/2745
                              Fax:      (212) 637-2527
                              Email:    Jaimie.Nawaday@usdoj.gov
                                        Joseph.Cordaro@usdoj.gov