# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, the STATE OF NEW YORK, the STATE OF CALIFORNIA, the CITY OF NEW YORK, and the CITY OF LOS ANGELES ex rel., MILTON DASILVA,<br><br>Plaintiffs,<br><br>v.<br><br>L-3 COMMUNICATIONS HOLDINGS, INC., L-3 COMMUNICATIONS CORPORATION, and L-3 COMMUNICATIONS EOTECH, INC.,<br><br>Defendants. | Civil Action<br><br>Case No. ______________________ |

FILED IN CAMERA AND UNDER SEAL
Under 31 U.S.C. § 3730(B)(2), N.Y. STATE FIN. LAW CH. 56, ARTICLE XII, § 190(2)(b), and CAL. GOV'T. CODE § 12652(c)(2)

DO NOT MAKE AVAILABLE ON PACER

## COMPLAINT

Mr. Milton DaSilva ("Relator"), individually, and as Relator for the United States of America, the City of New York, the City of Los Angeles, the States of New York and California (including agencies and other political subdivisions), for this *qui tam* Complaint against Defendant L-3 Communications Holdings, Inc. ("L3CH"), L-3 Communications Corporation ("L3CC"), and L-3 Communications EOTech, Inc. ("EOTech"), and alleges:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties for the United States of America, New York City, the City of Los Angeles, and the States of New York and California (including agencies and political subdivisions) arising from false and/or fraudulent claims made, used, presented, and/or caused to be made, used or presented by defendants L3CH, L3CC, and EOTech (collectively, "Defendants"), and/or their agents, employees and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA"), the New York False Claims Act, New York State Finance Law, Ch. 56, Article VIII, § 187, *et seq*. (the "NYFCA"), and the California False Claims Act, Cal. Gov't. Code § 12651 *et seq.* (the "CFCA"). Relator anticipates that, as additional victims of the fraud are identified, this Complaint is intended (and as permitted, will be amended) to include such claims under the FCA, and all analogous state and municipal false claims acts. The Government victims of Defendants' fraud are referred to collectively as the "Real Parties."

2. Defendants' conduct described below violates the FCA. The FCA was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the statute to enhance the federal Government's ability to recover losses sustained because of fraud against the United States after finding fraud in federal programs was pervasive, and that the statute, which Congress characterized as the primary tool for combating fraud committed against the Government, was in need of modernization. Congress intended that the amendments create incentives for individuals knowing of fraud against the United States to disclose that information

without fear of reprisals or government inaction and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3. One of Congress's primary concerns when it first enacted the FCA in 1863 was the problem of unscrupulous contractors' sale of defective products to the Government. *See* Cong. Globe 37th Cong., 3d Sess. 955 (1863) ("Persons have been employed to furnish shells for the use of the Army; and in several cases it has turned out that these shells have been filled not with the proper explosive materials for use, but with saw-dust") (statement of Sen. Howard); *see also* H.R. Rep. No. 37-2, Pt. 1, at 37, 120-21 (discussing purchase of defective muskets and "rotten and condemned blankets" unfit for use by troops); H.R. Rep. No. 37-2, pt. 2, at LVI (discussing delivery of horses with all the "ills" which horse "flesh is heir to" and worthless coffee that "seems to be a compound of roasted peas, of licorice, and a variety of other substances"). The FCA was enacted to deter and remedy these and similar problems; particularly where the Government has been sold defective, substandard or noncompliant goods or services to the detriment and jeopardy of the safety of the men and women in the armed forces of the United States.

4. The FCA therefore prohibits knowingly presenting (or causing to be presented) to the federal Government a false or fraudulent claim for payment or approval. 31 U.S.C. § 3729(a)(1)(A). Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the actual damages sustained by the United States. 31 U.S.C. § 3729(a)(1). The NYFCA and the CFCA, which are modeled on the FCA, contain substantially similar provisions. *See* New York State Finance Law, Ch. 56, Article VIII, § 187, *et seq*.; Cal. Gov't. Code § 12650, *et seq.* Courts have interpreted these provisions to impose liability and penalties for all claims made under fraudulently-induced contracts and all claims made pursuant to the knowing sale or provision of substandard or defective products (among other things) in return for payment from federal or state treasuries The FCA, the NYFCA, and the CFCA allow any person having information about a violation of those statutes to bring an action on behalf of

the Government, and to share in any recovery. Each statute requires that the Complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

5. Based upon these provisions, *qui tam* Plaintiff/Relator Mr. Milton DaSilva seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

## II. NATURE OF THE CASE

6. This case epitomizes the particular type of wrongful conduct originally intended to be regulated and prevented by the federal False Claims Act, and its state analogs. To wit; the payment of federal and state treasury funds in remuneration for false or fraudulent claims submitted by government contractors that have unscrupulously provided defective and substandard goods to the armed forces of the United States and state police forces.

7. Relator has independent and personal knowledge of a lengthy and ongoing scheme to submit false or fraudulent claims for payment by federal and state governments.

8. Defendants, in enacting their fraudulent scheme, have knowingly and routinely sacrificed the safety and well-being of the men and women of the United States armed forces, and domestic police forces, in order to unjustly enrich themselves.

9. Defendants manufacture holographic weapons sights ("HWS" products)—technologically advanced gun sights with a viewing window that superimposes a "reticle" (a target-sight image, *e.g.*, crosshairs) upon an image of the object or person at which the weapon is aimed.

10. Although Defendants sell some of their products to hobbyists and private gun enthusiasts, Defendants' largest and most lucrative customer base is comprised of government military, security, and law-enforcement agencies.

11. As set forth in greater detail below, Relator has personal knowledge that Defendants have knowingly supplied the Real Parties with defective HWS products for at least six years. Defendants' own senior personnel have admitted to Relator that all of Defendants'

HWS products have an inherent defect that makes them prone to failure; that the problem is acute if the products are stored or used in hot or humid climates, such that the products are completely unsuited for such climates; and that Defendants have known about this problem for years.

12. Despite this knowledge, Defendants have continued to sell their defective HWS products to the Real Parties, have refused to disclose the defect to the Real Parties, have actively concealed the defect from them, and have even falsely promoted their HWS products as reliable in "even ... the most hostile operational environments."

13. Each submission to the Real Parties of a claim for payment for an HWS product was a false claim under the FCA, the NYFCA, and the CFCA both because Defendants knowingly supplied defective products to the Real Parties and because Defendants' misrepresentations about the products fraudulently induced the contracts for the purchase of these products. But for Defendants' misrepresentations and false claims, the Real Parties would not have purchased the HWS products, nor entered into contracts requiring them to do so.

14. Defendants knowingly submitted or caused to be submitted false claims for payment or made false statements, as defined by the FCA, the NYFCA, and the CFCA, about the defective HWS products. These claims were factually false because the HWS products for which these claims were submitted were defective and, thus, in each instance, the contracted-for item - a non-defective Holographic Weapon Sight – was never delivered. Because the HWS products do not meet the requirements and expectations discussed in the Complaint, the HWS products were defective and the Real Parties did not get what they bargained for – non-defective HWS products. As a result, the claims for payment submitted by Defendants, and others selling Defendants' defective products, were factually false.

15. To this day, U.S. armed forces and state police agencies are relying on Defendants' products to perform as promised in extremely dangerous combat environments. This reliance, combined with Defendants' blatant failure to notify the Government of the inherent

defect in all of their HWS products, ***has created an ongoing and substantive risk of harm to American military and police personnel.***

## III. PARTIES

16. Plaintiffs, Real Parties, include the United States of America, the City of New York, the City of Los Angeles, the States of New York and California. This case is brought on behalf of Real Parties, by Relator, for damages arising from false claims submitted to and paid for by the Real Parties' agencies and political subdivisions, including but not limited to:

a. United States Department Defense;

b. United States Department of Homeland Security;

c. United States State Department;

d. United States Secret Service;

e. United States Department of Justice;

f. United States Treasury;

g. New York Police Department; and

h. Los Angeles Police Department.

17. Relator is a resident of Michigan. He worked as a Quality Control Engineer at the EOTech facility in Ann Arbor, Michigan, from May 14, 2013 to June 25, 2013. Prior to his employment at EOTech, Relator worked for Chrysler, Ford, and General Motors as a Quality Engineer, and has extensive experience in quality control systems, processes, and protocols.

18. Defendant EOTech is a Michigan corporation with a principal business address at 1201 E. Ellsworth Road, Ann Arbor, Michigan, 48108. EOTech designs, manufactures, and markets electro-optics products and systems, including holographic weapons sights.

19. Defendant L3CC is a Delaware corporation with a principal business address at 600 Third Avenue, New York, New York, 10016. L3CC is a prime contractor in various intelligence, defense and military, national security, and maritime and ground vehicle systems

41. EOTech's Terms of Sale provide a Warranty for "[a]ll L-3-EOTech products..." and promises that "every product will be free from defects in materials and workmanship for a period of 2 years from the original purchase date."

42. These statements and promises were *false*. EOTech has known for years, that its HWS products have an inherent design flaw that prevents the effective sealing of the target-sight window. Internally, EOTech refers to this problem as "delamination." As a result, moisture enters the viewing component, and the reticle will degrade until it is unusably faint or nonexistent. In some environments (especially humid or hot environments), this degradation is extremely rapid, and may occur in a matter of days. EOTech internally acknowledges its delamination defect occurs in all of its HWS products, and that its HWS products are simply inappropriate for use in some environments. Yet EOTech has refused to fix the problem and has refused to inform its government customers of the inherent design flaw in its HWS products or that those products are inappropriate for certain environment. Instead, it has continued to assert its HWS products are designed for "even … the most hostile operational environments" and "environmental extremes," and to sell those products to military, security, and law-enforcement agencies despite its knowledge that the products are inappropriate for some or all of those agencies.

43. Due to EOTech's failure to notify the Real Parties of the problems with the defective and substandard HWS products, United States military and police personnel continue to use and rely upon these products to this day.

44. The use and reliance upon defective weapon sight systems poses a serious threat to the safety of those who use Defendants' HWS products in combat situations and may result in the inability of military and police forces to maintain combat readiness and effectiveness.

**A. The HWS Delamination Defect**

45. Relator worked as a Quality Control Engineer in EOTech's Ann Arbor, Michigan, factory from May 14, 2013 to June 25, 2013. Within a month of beginning work, Relator learned from colleagues about a "moisture incursion" defect in *all* of EOTech's products.

46. The moisture incursion problem affects a critical component of an HWS product; its "holographic grating." The grating is composed of a thin layer of gelatin between two glass plates. As part of the manufacturing process, moisture is baked out of the gelatin layer to achieve a 6 micrometer thickness. This thickness is necessary to enable proper optical performance of the HWS. The grating (including the gelatin and the glass plates) is cut to the proper size, and then sealed with an adhesive laminate. This grating must remain free of moisture for the HWS to work properly.

47. EOTech has long known that the laminate seal around its HWS product gratings cannot effectively prevent the entry of moisture into those gratings. EOTech refers to the permeability of its grating seals to moisture as "delamination."

48. The delamination of EOTech's HWS seals, in turn, results in a problem that EOTech refers to as "moisture incursion." According to EOTech's own assessment of the "Grating Moisture Incursion Issue":

- Moisture/water vapor is penetrating the edge seal material
- The moisture begins to diffuse through the gelatin layer across the entire grating
- Rehydration of the gelatin causes a shift of grating wavelength
- Results in reduced optical performance, most notably a dimming of the visible reticle pattern
- Severity of performance reduction varies from slight reticle pattern dimming near the edges of the viewing window <u>to an almost non-visible reticle</u>.

(emphasis added)

49. In September 2012, EOTech identified "moisture incursion" as a "legacy issue"—*i.e.*, a long-standing problem—and the "#1 reason for returned sights." EOTech, prompted in part by the Department of Homeland Security's return of non-working sights, made extensive efforts to find a design solution to the moisture incursion problem, but was unable to do so. Nonetheless, EOTech failed to inform its customers that the failure of returned HWS sights was due to an inherent design flaw rather than a non-recurring manufacturing defect, that all of its HWS products suffered from the same flaw, or that its HWS products were particularly unsuited for certain environmental conditions, including high humidity or high temperatures.

50. In February 2013, in investigating the moisture incursion problem, EOTech attempted to gauge the rate of moisture incursion and reticle degradation resulting from the HWS's delamination defect. EOTech inspected 29 HWS products manufactured between April 2004 and April 2012. Every HWS inspected showed some moisture incursion. of the 29 products inspected—including every HWS manufactured prior to 2011, or at least 14 months prior to the inspection date—showed some degradation, ranging from "dim, no demarcation" (*i.e.*, a faded, blurry reticle) to "no reflection" (*i.e.*, total failure). In short, this inspection demonstrated that EOTech's delamination and moisture incursion problems affect every HWS manufactured, and very quickly lead to either severe degradation or total failure. Not surprisingly, moisture incursion is by far the greatest cause of returns and customer warranty repair requests (though, as EOTech knows, the customers are unaware that the product failures are a result of a moisture incursion defect, and generally assume that the problems result from battery failure).

51. Soon after being hired, Relator learned of the delamination and moisture incursion problems with EOTech's HWS products. Relator's position as an EOTech Quality Manager required him to review warranty claims for HWS products. During this review, Relator discovered that the vast majority of warranty claims for HWS products resulted from moisture incursion problems. Relator began to conduct a further investigation to determine whether EOTech could fix the problems or, instead, whether he needed to commence an "8D"—a formal

corrective action process that includes isolating the problem from any customer—and issue a written notice of deviation that would inform customers and users of the flaws in the HWS product.

52. On June 13, 2013, Relator met with Mr. Joe Veltri (EOTech's Product Assurance Manager, and Relator's immediate supervisor), Ms. Sandy Wakefield (EOTech's Director of Quality, and Joe Veltri's supervisor), Mr. Joseph Buckley (an EOTech Senior Manufacturing Manager), Ms. Fran Beard (EOTech's Lead Quality Engineer), and an EOTech Senior Optics Engineer named "Sue." At this meeting, in response to concerns Relator raised about the delamination problem, Sandy Wakefield told Relator that "we need to keep [the moisture incursion defect] under wrap, because by law we have to disclose and discuss certain defects with Crane" (the Naval Service Warfare Center Crane Division), a division of the U.S. Navy and an EOTech customer. When Relator questioned this instruction, Ms. Wakefield explained that if the problem was investigated, it would show that EOTech knew about the legacy problem and did not properly report it, adding, "don't you want your job here to last?"

53. Despite Ms. Wakefield's express instructions to keep the moisture incursion defect "under wrap," Relator continued to investigate the problem. On June 14, 2013, Relator spoke with Mr. Ed Awad, EOTech Senior Plant Manager, Joseph Buckley, and Mr. Calvin Bradbury, an EOTech Supplier Quality Engineer.

54. In that conversation, Mr. Buckley agreed that the moisture incursion defect affected "every product with the grating," and that the defect would cause degradation of the reticle, *i.e.*, failure, on every HWS product in the field.

55. In the same conversation, Mr. Awad stated that EOTech's product has "always been bad" as a result of the moisture incursion defect, that he had known about the problem for at least six years, and that some products had delamination and moisture incursion before they were even shipped to customers. Mr. Awad agreed that EOTech was knowingly making a bad product and that it needed to fix it. Nonetheless, Mr. Awad urged Relator to ignore the moisture

in even the most hostile operational environments." And although EOTech publicly proclaims its commitment to produce quality and satisfy customer expectations, EOTech's management privately admits, unanimously, that every EOTech HWS product carries an inherent delamination defect that will lead to moisture incursion, to degradation, and, in many or most cases, to premature failure.

64. Despite EOTech's knowledge of the inherent defect in its HWS product and the product's related unsuitability for circumstances that require reliability in dangerous and life-threatening circumstances—basically the definition of the mission of the military, security, and law-enforcement agencies who are Defendants' most important customers—EOTech refused to permit Relator to write a "deviation" notifying EOTech's customers of the defect in its HWS products. And despite EOTech's acknowledgement that the HWS "is the wrong product" for customers in hot or humid environments, EOTech refuses to inform its customers of that limitation, and instead sells its HWS products to customers who EOTech knows will use those products in either hot or humid environments, including the United States military (which is engaged in operations in every climate), New York law enforcement agencies (which operate in hot and humid environments every year), and California law enforcement agencies (some of which operate in environments that are hot year-round).

65. Defendants manufacture approximately 900 HWS products each day. Most of these are sold to government military, security, or law enforcement agencies. EOTech's HWS products range in price from several hundred dollars to over a thousand dollars each. Each of these sights is substandard and defective because of the delamination and moisture incursion problems described above.

66. Relator has personal knowledge that military and police agencies would return inoperable HWS products to Defendants, and Defendants, under the guise of their warranty, would replace the returned products with similarly defective HWS products, thereby, never truly

addressing the defective nature of the products; products that Defendants knew were to be used in combat environments.

67. In his position as Quality Control Engineer, Relator dealt with warranty claims for the HWS products. Consumers seeking to invoke the warranty for their HWS products were frequently told by Defendants' employees that the issues with their products were due to battery malfunction, or misuse. In reality, the overwhelming majority of all HWS warranty claims were related to the delamination defect and moisture incursion.

68. Relator has personal knowledge that Defendants would purposefully manipulate warranty data in order to inflate the reliability statistics for their HWS products by not accounting for the true number of returned products. Defendants would, in turn, use the manipulated warranty data to entice government agencies, and private distributors, to purchase their HWS products.

69. Upon information and belief, Defendants sell their defective and substandard HWS products directly to government agencies through fixed price contracts.

70. Upon information and belief, the delamination defect common to all of Defendants' HWS products represents a failure to meet the design, performance, and functional specifications that are material to the governments' decisions to award fixed price contracts to the Defendants, and to remit payments for the HWS products that are the subject of those contracts.

71. Upon information and belief, Defendants have sold their defective and substandard products to federal and state government agencies under "Brand Name or Equal" purchase order descriptions. The justifications cited by agencies to solely purchase Defendants' HWS products were based upon the aforementioned misrepresentations regarding the ability of the HWS products to operate in specific environmental and combat scenarios. The characteristics of "waterproof," "fogproof," shockproof," and "temperature proof," were material characteristics to the governments' decisions to restrict competition, and had the truth about Defendants'

products been known, the Defendants products would not have been purchased by the federal or state agencies.

72. Defendants also sell their defective and substandard HWS products to the federal and state governments through secondary suppliers and small businesses. These secondary suppliers submit claims for payment for Defendants' HWS products.

**COUNT I**

**Violation of the Federal False Claims Act**

**31 U.S.C. § 3729 (a)(1); 31 U.S.C. § 3729(a)(1)(A)**

**Against All Defendants**

73. Plaintiffs/Relator re-allege and incorporate paragraphs 1 through 74 as if fully set forth herein.

74. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

75. As described above, EOTech knowingly sold defective HWS products to the United States and agencies thereof.

76. As a result of the above-described conduct, contracts for the sale of HWS products to the United States, including departments and agencies thereof, were induced by false statements and/or fraud.

77. By virtue of the acts described above, Defendants, and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and are still presenting or causing to be presented, false or fraudulent claims to the United States Government, and the governments of the States of California and New York, for payments or approvals, and/or presented false or fraudulent claims, records and statements in order to obtain payments for Defendants' HWS products.

78. These claims, records, and statements submitted to the United States, ultimately resulting in sales of EOTech HWS products to the Government, constitute false claims and were, and continue to be, violations of 31 U.S.C. § 3729 (a)(1); 31 U.S.C. § 3729(a)(1)(A).

79. The United States Government, unaware of the falsity of claims submitted or caused to be submitted by the defendants, paid and continues to pay the claims that would not be paid but for Defendants' false statements, wrongful actions and/or fraudulent conduct.

80. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

**<u>COUNT II</u>**

**Violation of the Federal False Claims Act**

**31 U.S.C § 3729(a)(2); 31 U.S.C. § 3729(a)(1)(B)**

**Against All Defendants**

81. Plaintiffs/Relators re-allege and incorporate paragraphs 1 through 74 as if fully set forth herein.

82. This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

83. By virtue of the acts described above, Defendants, their agents and/or employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, caused to be made or used, and is still making, using, or causing to be made or used, false records or statements material to the payment of these false or fraudulent claims in violation of 31 U.S.C § 3729(a)(2); 31 U.S.C. 3729(a)(1)(B).

84. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

Respectfully Submitted,

Ari Kresch
akresch@1800lawfirm.com
1-800-LAW-FIRM
380 Lexington Avenue Suite 3800
New York, NY 10168
212-453-9851
Fax: 248-436-6858

Peter J. Mougey, Esq.
*pmougey@levinlaw.com*
Christopher G. Paulos, Esq.
*cpaulos@levinlaw.com*
Laura S. Dunning, Esq.
*ldunning@levinlaw.com*
LEVIN, PAPANTONIO, THOMAS,
MITCHELL, RAFFERTY & PROCTOR P.A.
316 S. Baylen Street, Suite 600
Pensacola, Florida 32502
Office: 850-435-7067
Fax: 850-436-6066

*Attorneys for Plaintiff/Relator*