UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                Plaintiff,

  -v-

L-3 COMMUNICATIONS EOTECH, INC.,
L-3 COMMUNICATIONS CORPORATION,
and PAUL MANGANO,

                Defendants.

No. 15-cv-9262 (RJS)
OPINION AND ORDER

---

RICHARD J. SULLIVAN, District Judge:

On November 24, 2015, the United States of America (the "government") commenced this action against Defendants L-3 Communications EOTech, Inc. ("EOTech"), L-3 Communications Corporation ("L-3"), and Paul Mangano, to recover damages and civil penalties arising out of a scheme to defraud various government agencies in connection with EOTech's sale of defective holographic weapon sights. (*See* Doc. No. 1.) On November 25, 2015, one day after the complaint was filed, the parties filed a stipulation of settlement and dismissal, pursuant to which Defendants agreed to pay a settlement amount of $25.6 million to resolve the government's claims against them. (Doc. No. 5.) The Court so-ordered that stipulation and closed the case. (*Id.*)

Now before the Court is a motion by non-party Milton DaSilva, who had originally filed a *qui tam* relator complaint in April 2014 against Defendants pursuant to the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, but voluntarily dismissed that complaint without prejudice before this action commenced. (Doc. No. 14.) DaSilva seeks a declaration that he is entitled to a share of the government's $25.6 million settlement with Defendants under Section 3730(c)(5) of the FCA, which generally entitles a relator to a share of a recovery obtained by the government

through an "alternate remedy" to the action initiated by the relator. 31 U.S.C § 3730(c)(5). For the reasons set forth below, the Court denies DaSilva's motion.

I. BACKGROUND[1]

DaSilva worked as a quality control engineer at EOTech from May 14, 2013 until June 25, 2013, when EOTech terminated his employment. (Rel. Compl. ¶¶ 45, 61.) On August 13, 2013, DaSilva, through counsel, made pre-filing disclosures to the government regarding EOTech's production and sale of defective weapon sights in violation of the FCA. (Radner Aff. ¶¶ 1, 4.) On August 22, 2013, DaSilva was convicted of unrelated criminal offenses in the State of Michigan, and his sentencing was scheduled for September 25, 2013. (*Id.* ¶ 7.) Instead of appearing for sentencing, however, DaSilva fled to Brazil, where he is a citizen. (*Id.*) As of the filing of the instant motion, DaSilva continues to reside in Brazil and remains a fugitive. (*Id.* ¶ 37.)

After discussions with the government regarding his allegations against EOTech broke down (*see id.* ¶¶ 8–24), DaSilva filed a *qui tam* complaint under seal on April 25, 2014, asserting claims under the FCA and various state statutes on behalf of himself, the United States, the State of New York, the State of California, and the City of Los Angeles (*id.* ¶ 26; *see also* Doc. Nos. 14-1, 18-3). The case was designated civil action number 14-cv-2928 and assigned to Judge Nathan. The *qui tam* complaint represented that DaSilva was a "resident of Michigan" and did not mention his criminal conviction or fugitive status. (Rel. Compl. ¶ 17.) Accordingly, on April 28, 2014, the government emailed DaSilva's counsel requesting his position on why DaSilva, a fugitive residing

---

[1] The following background information is taken from the affidavit of Solomon Radner, Esq., submitted in support of DaSilva's motion (Doc. No. 14-2 ("Radner Aff.")), DaSilva's *qui tam* complaint (Doc. Nos. 14-1, 18-3 ("Rel. Compl.")), and various unsealed filings from the dismissed *qui tam* action. The facts necessary to resolve DaSilva's motion are not in dispute. In ruling on DaSilva's motion, the Court has also considered DaSilva's motion and memorandum of law (Doc. No. 14 ("Mem.")), the government's memorandum in opposition (Doc. No. 17 ("Opp'n")), the declaration of Joseph N. Cordaro in support of the government's opposition (Doc. No. 18), and DaSilva's reply memorandum (Doc. No. 19 ("Reply")).

2

in Brazil, was listed in the *qui tam* complaint as a Michigan resident, and whether counsel's representation of a fugitive in a new civil matter, asserting claims on behalf of the United States, complied with the applicable rules of professional conduct. (Radner Aff. ¶ 28.) On July 8, 2014, Judge Nathan issued an order indicating that the government, in an ex parte submission, had represented that DaSilva was "wanted by Michigan authorities after fleeing to Brazil prior to sentencing for certain crimes he was convicted of in 2013" and that "counsel for Mr. DaSilva have stated their intention to withdraw and voluntarily dismiss th[e *qui tam*] action if Mr. DaSilva did not surrender by June 23, 2014." (Cordaro Decl. Ex. B.) Because that date had passed, Judge Nathan's order also directed DaSilva's counsel to "submit a status letter by July 18, 2014 indicating whether Mr. DaSilva remains a fugitive and, if so, whether and when they plan to withdraw and dismiss this action." (*Id.*) The order also notified counsel that failure to submit a letter by July 18 would result in dismissal of DaSilva's case. (*Id.*)

On August 14, 2014, Judge Nathan issued an order explaining that she had received two letters: one from DaSilva's counsel on July 18, 2014, requesting that the court not dismiss the case "despite their earlier representation to the [g]overnment that they would voluntarily withdraw the complaint if DaSilva did not surrender to Michigan authorities by June 23, 2014" (Cordaro Decl. Ex. C), and one from the government on July 31, 2014, indicating that it would move to dismiss if DaSilva's counsel did not voluntarily dismiss their complaint (*id.*). Because DaSilva's counsel had "neither withdrawn their complaint nor indicated that DaSilva ha[d] surrendered," Judge Nathan directed the government to file its motion to dismiss by August 31, 2014. (*Id.*)

On August 19, 2014, before the government moved to dismiss, DaSilva's counsel filed with the government's consent a request for voluntary dismissal without prejudice. (*Id.* Ex. D.) Accordingly, on September 3, 2014, after the government confirmed its consent, Judge Nathan

3

issued an order dismissing DaSilva's *qui tam* action without prejudice and directing that the case remain under seal. (*Id.* Ex. E.)

As noted above, on November 24, 2015, well over a year after DaSilva's complaint was dismissed without prejudice, the government initiated the instant action against EOTech, L-3, and Paul Mangano, bringing claims under the FCA and various state law theories of recovery. (Doc. No. 1.) And on November 25, 2015, one day after the complaint was filed, the parties filed a stipulation of settlement and dismissal, which this Court so-ordered, settling the government's claims for $25.6 million. (Doc. No. 5.)

DaSilva filed the instant motion on April 14, 2016, seeking a declaration that he is entitled to a share of the government's settlement proceeds under Section 3730(c)(5) of the FCA because the settlement was an "alternate remedy" to pursuing the action initiated by DaSilva. (*See* Mem. at 6–7.) While the government and DaSilva dispute the extent to which the government's recovery depended on DaSilva's *qui tam* complaint and disclosures, those issues are not relevant to the Court's decision on the question presented by DaSilva's motion. Rather, the government argues that, because DaSilva voluntarily dismissed his *qui tam* action, the government's own action was not an "alternate" to pursuing DaSilva's action, and thus DaSilva has no right to share in the government's recovery. (*See* Opp'n at 1.) The motion was fully briefed by May 12, 2016. (Doc. No. 19.) For the reasons set forth below, the Court agrees with the government.

## II. LEGAL STANDARD

"The FCA imposes liability on any person who," among other things, "'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval' to the U.S. government; or who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Polansky v. Pfizer, Inc.*, 822 F.3d 613, 618 (2d Cir. 2016) (quoting 31 U.S.C. § 3729(a)–(b)). "From its enactment, the

4

FCA has encouraged private citizens to report fraud by promising a percentage of any eventual recovery." *Bishop v. Wells Fargo & Co.*, 823 F.3d 35, 44 (2d Cir. 2016); *see also United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 23 (2d Cir. 2016) ("The goal of the FCA's *qui tam* provisions is to prevent and rectify frauds by government contractors, by incentivizing private individuals to uncover and prosecute FCA claims." (collecting cases)). Thus, the FCA permits a private person, known as a "relator," to bring a *qui tam* action in his own name and in the name of the United States for a violation of the FCA. *See* 31 U.S.C. § 3730(b)(1); *see also Ladas*, 824 F.3d at 23 ("A person pursuing a *qui tam* action under the False Claims Act – the relator – asserts a claim based on a right belonging to the United States." (citing *Vt. Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 768 n.1 (2000))).

The FCA requires the relator to serve the government with his complaint and a "written disclosure of substantially all material evidence and information [he] possesses." 31 U.S.C. § 3730(b)(2). The complaint must be filed ex parte and remain under seal for at least 60 days, and within 60 days of receiving "both the complaint and the material evidence and information," the government "may elect to intervene and proceed with the action." *Id.* "Before the expiration of the 60-day period or any extensions" of that period for good cause, the government must choose between intervening and proceeding with the *qui tam* action itself, or declining to intervene, in which case the relator has the right to conduct the action. *Id.* § 3730(b)(4).

If the *qui tam* suit is successful, the relator generally may receive a portion of the recovered funds. *Id.* § 3730(d). If the government has intervened and taken over the action, the relator may receive 15 to 25 percent of the proceeds of the action or settlement. *Id.* § 3730(d)(1). If the government has declined to intervene, the relator may receive 25 to 30 percent. *Id.* § 3730(d)(2).

5

In addition to the intervene-or-abstain options set forth above, the FCA permits the government to pursue other available remedies, and the statute preserves the right of the relator to share in the proceeds of those remedies under certain circumstances. Specifically, the FCA provides that, "[n]otwithstanding [31 U.S.C. § 3730(b)], the [g]overnment may elect to pursue its claim through any *alternate remedy* available to the [g]overnment, including any administrative proceeding to determine a civil money penalty." *Id.* § 3730(c)(5) (emphasis added). If the government pursues such an "alternate remedy," the relator retains "the same rights in such proceeding as [he] would have had if the action had continued under this section." *Id.*

### III. DISCUSSION

As noted above, DaSilva seeks a declaration that he is entitled to a share of the government's $25.6 million settlement with Defendants because, he claims, the instant action and settlement were an "alternate remedy" under the FCA, 31 U.S.C. § 3730(c)(5). DaSilva's motion requires the Court to examine what effect, if any, the without-prejudice dismissal of DaSilva's *qui tam* action has on DaSilva's ability to invoke Section 3730(c)(5). In other words, the Court must determine whether a civil action initiated and settled by the government after a relator has voluntarily dismissed his *qui tam* action constitutes an "alternate remedy" within the meaning of Section 3730(c)(5). "Legislative interpretation begins with the plain text of the statute and, where the text is unambiguous, also ends there because the 'judicial inquiry is complete.'" *Alcantara v. Bakery & Confectionery Union & Indus. Int'l Pension Fund Pension Plan*, 751 F.3d 71, 77 (2d Cir. 2014) (quoting *Hedges v. Obama*, 724 F.3d 170, 189 (2d Cir. 2013)); *accord Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Although the Second Circuit has yet to address the effect of a without-prejudice dismissal of a *qui tam* action on the relator's right to share in later settlement proceeds under the "alternate remedy" provision of the FCA, the Court finds that the terms of Section 3730(c)(5) unambiguously preclude such recovery.

6

By beginning with the phrase "[n]otwithstanding subsection (b)," Section 3730(c)(5) makes clear that the "alternate remedy" described in that section is an "alternate" to the government's options listed in Section 3730(b).  Specifically, Section 3730(c)(5) governs the relator's rights when the government "elect[s] to pursue its claim through any alternate remedy," 31 U.S.C. § 3730(c)(5) – that is, an "alternate" to the remedies set forth in Section 3730(b)(4), which are limited to (a) intervening and "proceed[ing] with the [*qui tam*] action" or (b) "declin[ing] to take over the action" and providing the relator with "the right to conduct the action," 31 U.S.C. § 3730(b)(4).  The implication of this framework is clear:  when there is no *qui tam* action for the government to "take over," the government's filing of its own action is not an "alternate" to taking over (or not taking over) a *qui tam* action.  *See Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) ("Statutory language 'cannot be construed in a vacuum.  It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012))).  Framed in terms of the instant action, a dismissed *qui tam* suit does not present the government with the choice between acting under subsection (b)(4) or pursuing an "alternate remedy" authorized by subsection (c)(5).  Accordingly, the government's commencement and settlement of this action was not an "alternate remedy" to DaSilva's *qui tam* action because DaSilva had dismissed his action.

DaSilva and the government have identified no cases – in the Second Circuit or otherwise – addressing this precise issue; indeed, case law interpreting Section 3730(c)(5) in any context is scarce.  But the Court's own research has identified one case, *Webster v. United States*, 217 F.3d 843, 2000 WL 962249 (4th Cir. 2000), that discusses the effect of voluntary dismissal on a relator's ability to invoke the "alternate remedy" provision.  Though unreported and out-of-circuit, *Webster*

7

is nevertheless precisely on point and ultimately persuasive. In that case, plaintiff filed a *qui tam* action alleging that a contractor had "fraudulently obtained money from the [Drug Enforcement Administration] by submitting false invoices and vouchers requesting payment for work that had not been performed," and that a DEA account manager "had knowingly approved payment of the false claims." *Id.* at *1. The government "declined to intervene," and plaintiff thereafter "voluntarily dismissed her *qui tam* action without prejudice" with the government's consent. *Id.* At the time plaintiff dismissed her case, "criminal charges and a civil forfeiture proceeding were pending against" the DEA account manager. *Id.* Thus, plaintiff allegedly believed that "there would be nothing left to recover in her *qui tam* suit once those other actions concluded," but she dismissed without prejudice because she "wanted to preserve [her] right to bring th[e] action again should circumstances change." *Id.* Three months later, the government filed its own civil action against the contractor, the account manager, and several other defendants, "alleging false claims, conspiracy to defraud the government, and several additional common law causes of action." *Id.* "The government did not inform [plaintiff] of its intent to file the suit," and plaintiff sought to intervene once she learned of it. *Id.*

The district court denied the motion, *id.*, and the Fourth Circuit affirmed, explaining that voluntary dismissal "'wipes the slate clean, making any future lawsuit based on the same claim an entirely new lawsuit unrelated to the earlier (dismissed) action,'" *id.* at *2 (quoting *Sandstrom v. ChemLawn Corp.*, 904 F.2d 83, 86 (1st Cir. 1990)). Thus, the Fourth Circuit found that the plaintiff's "assertion that her voluntarily dismissed complaint confer[red] on her a continuing right to participate in the government's subsequently filed FCA suit [was] simply wrong." *Id.* The court reasoned that plaintiff could not "assert the rights of an original *qui tam* plaintiff . . . because she abandoned those rights when she voluntarily dismissed her suit." *Id.* The court also observed

8

that plaintiff's reading of the "alternate remedy" provision would unacceptably "allow a private party to file a *qui tam* false claims suit with no intention of pursuing it, dismiss the suit without prejudice, and then, when the government chose to investigate and prosecute its own claim, clamber back on board." *Id.* at *3.

The parallels between *Webster* and this case are obvious:  DaSilva filed a *qui tam* suit and then voluntarily dismissed it.  The effect of that without-prejudice dismissal was two-fold.  First, as in any case, the dismissal "le[ft] the situation as if the action never had been filed," 9 Charles Alan Wright & Arthur R. Miller *et al.*, *Federal Practice and Procedure* § 2367 (3d ed. 2016), and "render[ed] the proceedings a nullity," 8 *Moore's Federal Practice* § 41.40[9][b] (2016).  *See also Oneida Indian Nation of N.Y. State v. Oneida Cty.*, 622 F.2d 624, 629 n.7 (2d Cir. 1980) ("[V]oluntary dismissal of a suit leaves the situation so far as procedures therein are concerned the same as though the suit had never been brought . . . .").  Second, for purposes of the FCA's "alternate remedy" provision, that dismissal left the government with no suit in which to intervene, and thus left DaSilva with no right to share in the proceeds of a proceeding thereafter pursued by the government.  As a result, Section 3730(c)(5) provides DaSilva with no basis for claiming a share of the government's settlement.

Other decisions relied on by the parties that have addressed Section 3730(c)(5), though they do not speak directly to the instant issue, are at least consistent with the notion that a relator cannot claim a share of an "alternate remedy" unless he has an existing *qui tam* action, thereby providing the government with the option to intervene.  *See, e.g.*, *United States ex rel. Babalola v. Sharma*, 746 F.3d 157, 159 (5th Cir. 2014) (holding that, because the relators filed suit *after* the government had obtained a restitution award against the defendants, "there was no *qui tam* action pending at the commencement of the restitution proceeding," and thus "the restitution proceeding

9

[did] not constitute an alternate remedy under the statute"); *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 647–48 (6th Cir. 2003) ("'[A]lternate remedy' refers to the government's pursuit of *any alternative to intervening* in a relator's *qui tam* action." (emphasis added)); *United States ex rel. Barajas v. United States*, 258 F.3d 1004, 1010 (9th Cir. 2001) ("An alternate remedy under [Section] 3730(c)(5) is a remedy achieved through the government's pursuit of a claim *after it has chosen not to intervene* in a *qui tam* relator's FCA action. The use of the term 'alternate remedy' makes clear that the government must choose one remedy or the other . . . ." (emphasis added)); *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 174 F. Supp. 3d 696, 703 (E.D.N.Y. 2016) ("[W]here the government elects to pursue an alternate remedy, the FCA grants all relators the same rights they would have in the relators' *qui tam* action. Where a relator lacks a valid *qui tam* claim *on which the government or the relator could proceed*, the relator lacks any rights to a recovery in that action." (emphasis added)); *United States v. Bisig*, No. 00-cv-335 (JDT), 2005 WL 3532554, at *4 (S.D. Ind. Dec. 21, 2005) (holding that the government had "elected to pursue its claim through an alternate remedy under [Section] 3730(c)(5)" where it "caused [a] stay of the *qui tam* action in order to pursue criminal prosecution against the [d]efendant and recover substantially all the [d]efendant's assets through forfeiture proceedings"). Thus, even the limited case law identified by the parties supports denying DaSilva a share of the government's recovery.

In short, DaSilva's decision to voluntarily dismiss his *qui tam* action in 2014 precludes him from clambering back on board for a share of the government's proceeds as though he had never dismissed his own action. To hold otherwise would contradict the plain language of Section 3705(c)(5) and provide DaSilva with a windfall to which he is not entitled under the statute. This the Court is unwilling to do.

IV. CONCLUSION

For the foregoing reasons, the Court finds that 31 U.S.C. § 3730(c)(5) provides no basis from which non-party Milton DaSilva would be entitled to a portion of the government's settlement against Defendants in this action. Accordingly, IT IS HEREBY ORDERED THAT DaSilva's motion for a relator's share is DENIED. The Clerk of the Court is respectfully directed to terminate the motion pending at docket number 14.

SO ORDERED.

Dated: February 3, 2017
New York, New York

_____
RICHARD J. SULLIVAN
UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/3/17